UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ADVANTA-STAR AUTOMOTIVE                      CIVIL ACTION
RESEARCH CORPORATION OF
AMERICA

VERSUS                                              NO. 20-1150

DEALERCMO, INC., ET AL.                      SECTION "R" (3)


**ORDER AND REASONS**

Before the Court is defendants DealerCMO, Inc. ("DealerCMO") and

Edward Dodd's motion for summary judgment.[1]  Plaintiff Advanta-STAR

Automotive Research Corporation of America ("Advanta-STAR") opposes

the motion.[2] For the following reasons, the Court grants defendants' motion.


I.      **BACKGROUND**

Advanta-STAR creates vehicle comparisons that are favorable to a

particular make and model by highlighting features of the car that will

compare favorably to other models.[3] Plaintiff provides these comparisons to

paid subscribers, often car dealerships, who, in exchange for a fee, can

---

[1]      R. Doc. 70.
[2]      R. Doc. 81.
[3]      R. Doc. 81-2 ¶¶ 3, 9 (Lemmon Declaration).

feature Advanta-STAR's comparisons on their website "to increase Search Engine Optimization ('SEO'), website traffic, and time-on-site."[4]  Advanta-STAR maintains a copyrighted database that contains hundreds of thousands of vehicle comparisons.  According to plaintiff, the three specific vehicle comparisons at issue in this case are protected by U.S. Copyright, specifically registration numbers TX 8-760-971 and TX 8-761-015.[5]

Advanta-STAR represents that it periodically searches the internet for any possible unauthorized distribution of its copyrighted content by searching for "distinctive phrases" that are used in its database.[6]  It was during one of these searches that Advanta-STAR found allegedly infringing material on the website of Hyundai of Slidell.[7]  Specifically, plaintiff found that its protected content had been copied verbatim on three vehicle comparisons posted on Hyundai of Slidell's website: (1) the 2019 Hyundai Tucson vs. the 2019 Nissan Rogue, (2) the 2019 Hyundai Sonata vs. the 2019 Toyota Camry, and (3) the 2019 Hyundai Santa Fe vs. the 2019 Kia Sorrento SUV.[8]  Plaintiff represents that the "text and information on the Infringing Webpages contained entire paragraphs that are identical to the copyrighted

---

[4]     *Id.* ¶ 7.
[5]     *Id.* ¶ 12.
[6]     R. Doc. 81-2 ¶ 16 (Lemmon Declaration).
[7]     *Id.* ¶ 19.
[8]     *Id.*

content of Plaintiff Advanta-STAR, except that the copyright notices and all identification of Plaintiff Advanta-STAR had been removed."[9]

Following this discovery, plaintiff represents that it conducted an investigation, during which it learned from Hyundai of Slidell that one of the dealer's vendors, DealerCMO, had placed the allegedly infringing material on the website.[10]  It is undisputed that DealerCMO never purchased or obtained a licensing agreement that would permit it to publish Advanta-STAR's content online.[11]  Advanta-STAR subsequently sent two demand letters to DealerCMO, but asserts that it received no "substantive response."[12]

On April 9, 2020, plaintiff filed suit against DealerCMO in this Court, asserting claims of (1) copyright infringement under 17 U.S.C. § 501, and (2) removal and falsification of copyright management information under 17 U.S.C. § 1202.[13]  On April 26, 2021, Advanta-STAR filed an amended complaint, adding Edward Dodd as a defendant in the litigation.[14]  Plaintiff alleges that Dodd is the President and CEO of DealerCMO, and that he "had

---

[9]     R. Doc. 53 ¶ 16 (Amended Complaint).
[10]    R. Doc. 81-2 ¶ 20 (Lemmon Declaration).
[11]    *Id.* ¶¶ 27-30.
[12]    *Id.* ¶ 20.
[13]    R. Doc. 2.
[14]    R. Doc. 48-2 at 2.

the ability to supervise the infringing activity by DealerCMO, had a financial interest in that activity, and/or personally participated in that activity."[15]  On November 30, 2021, defendants moved for summary judgment on both of plaintiff's claims, and requested that the Court award defendants their attorney's fees.[16]

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).   "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or

---

[15]     R. Doc. 53 ¶ 22 (Amended Complaint).
[16]     R. Doc. 70-3.

affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); see also Little, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by

pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

### B.   Copyright Infringement

"To establish a claim for copyright infringement, a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

6

As to the second element, the Court must make two separate inquiries to determine whether there has been "actionable copying."[17]   *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340-41 (5th Cir. 1994).  The first prong addresses what is known as factual copying, and asks "whether the alleged infringer actually used the copyrighted material to create his own work."  *Id.*  A plaintiff can make this factual showing either with direct evidence of copying, or through "circumstantial evidence demonstrating both (1) that the defendant had access to the copyrighted work and (2) that the two works are 'probatively similar.'"  *Gen. Universal Sys.*, 379 F.3d at 141.  A plaintiff can show probative similarity "by pointing to 'any similarities between the two works,' even as to unprotectable elements, 'that, in the normal course of events, would not be expected to arise independently.'"  *Batiste v. Lewis*, 976 F.3d 493, 502 (5th Cir. 2020) (citations omitted).

The second prong asks "whether there is substantial similarity between the two works," thereby making the copying "legally actionable."  *Eng'g Dynamics*, 26 F.3d at 1341.  Although the question of substantial similarity is generally left to the factfinder, summary judgment for the defendant may

---

[17]    "Factual copying" and "substantial similarity" are "collectively termed 'actionable copying.'"  *Armour v. Knowles*, 512 F.3d 147, 152 & n.2 (5th Cir. 2007) (per curiam).

be appropriate if the Court finds, after viewing the evidence in a manner most favorable to the nonmoving party, that either (1) the similarity between the two works concerns only non-copyrightable elements of plaintiff's materials, or (2) no reasonable juror could find that the two works were substantially similar. *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 395 (5th Cir. 2001); *Warner Bros., Inc. v. Am. Broadcasting Co.*, 720 F.2d 231, 239-40 (2d Cir. 1983). And because "plaintiff bears the burden of proving that the works at issue are substantially similar in a copyright infringement case," granting summary judgment for a defendant "is appropriate when plaintiff fails to make a sufficient showing that the . . . expressive elements of the works are substantially similar." *Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 528 (9th Cir. 1987).

## III.   DISCUSSION

Plaintiff asserts that defendants' three vehicle comparisons on Hyundai of Slidell's webpage contain copied text and information that is identical to plaintiff's copyrighted content. Notably, Advanta-STAR does not allege that defendants copied the entirety of its three comparisons,[18] and

---

[18]   R. Doc. 81-1 at 6.

8

admits that there are differences between the two works.[19]  Defendants, for

purposes of the present motion, do not dispute that plaintiff has a valid

copyright covering its database as a whole,[20] nor that plaintiff has shown

factual copying.  Instead, defendants move for summary judgment only on

the issue of substantial similarity, arguing that plaintiff cannot prove that the

alleged infringing content is substantially similar to the protectable elements

---

[19]    R. Doc. 70-4 at 25, 28-31 (Lemmon Deposition at 90:10-20; 102:4-114:12).

[20]    Defendants, in their reply in support of summary judgment, note that plaintiff "for the very first time" in its opposition, raises "that there are undefined portions of Advanta-Star's three asserted car comparisons which were disclaimed in, and thus *not* protected by, the '971 and '015 registrations."  R. Doc. 87 at 5.  The Court finds that plaintiff did not raise this issue for the first time in its opposition, given that the certificates of registration, attached as exhibits to the complaint, include the same language that the registrations cover "revised and updated compilations of database material, which is generally revised and updated at least monthly; revised text, material, and images; and new text, material, and images.  R. Doc. 53-2 at 4; R. Doc. 53-3 at 3.

Despite defendants' assertions to the contrary, it is not plaintiff who raises an untimely claim, but defendants, who raise the possibility that plaintiff's copyright registrations do not cover the alleged infringed material for the first time in defendants' reply brief.  It is well established that "[n]ew arguments and legal theories raised for the first time in a reply brief cannot be considered by the court."  *Williams v. Williams*, No. 16-794, 2017 WL 2634202, at *2 (E.D. La. June 19, 2017) *see also Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are . . . waived."); *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008) ("[A]rguments cannot be raised for the first time in a reply brief.").

of plaintiff's database.[21]  Defendants additionally contend that, even if the content is copyrightable, the similarities between the two works are so insignificant that, under the *de minimis* doctrine, they cannot rise to the level of infringement.[22]

Plaintiff argues that, by selecting which vehicles and features to compare, and by articulating "facts in sentences, phrases, and tables that are clear and concise," its comparisons amount to far more than mere facts, and instead constitute creative expressions.[23]  Further, plaintiff asserts that it is a "massive undertaking" to "[s]tay up to speed with automobile features for literally hundreds of different makes and models."[24]  Because defendants only move for summary judgment on substantial similarity, the Court limits its analysis to that prong of plaintiff's cause of action.

## A.    Substantial Similarity

It is undisputed that Advanta-STAR's database as a whole has the requisite "minimal degree" of creativity to make it eligible for copyright protection.  The database contains plaintiff's original selection, arrangement,

---

[21]    R. Doc. 70-3 at 4 n.2.
[22]    R. Doc. 70-3 at 11.
[23]    R. Doc. 81 at 10.
[24]    *Id.* at 3.

and narratives of vehicle comparisons. *See S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 784 (5th Cir. 2020) ("[Plaintiff's] unique selection and arrangement of information exhibit creative expression."). But, although a "work itself may be original and subject to copyright, it may contain constituent elements that are not subject to copyright because they are not original or because they are otherwise unprotectable." *Batiste v. Najm*, 28 F. Supp. 3d 595, 600 (E.D. La. 2014). For instance, the constituent elements might "constitute a concept, method, or idea or fall under the doctrine of public domain or *scenes a faire.*" *Id.*

As articulated by the Fifth Circuit, courts conducting the substantial-similarity inquiry may engage in a two-step "filtration" analysis. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 551 & n.6 (5th Cir. 2015). First, because only "ideas that are subject to copyright protection" can be considered in determining whether two works are substantially similar, the unprotectable constituent elements of the work must be "filter[ed] out." *Id.*; *see also Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533-34 (5th Cir. 1994) ("To determine the scope of copyright protection in a close case, a court may have to filter out . . . unprotectable elements of plaintiff's copyrighted materials to ascertain whether the defendant

11

infringed protectable elements of those materials."); *Williamson v. Pearson Educ., Inc.*, No. 00-9240, 2001 WL 1262964, at *3 (S.D.N.Y. Oct. 19, 2001) ("In determining whether a material issue of fact exists regarding the alleged copying of plaintiff's protectible expression, it is helpful to first establish what is *not* protectible expression.").

After identifying the protectable elements of the work, the Court then conducts "a side-by-side comparison . . . between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Nola Spice*, 783 F.3d at 550 (citing *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (per curiam)).  In conducting this side-by-side analysis, courts may examine whether the individual elements alleged in the complaint are similar, as well as "the importance of the copied protectable elements to the copyrighted work as a whole."  *See id.* (collecting cases).

1. *Filtering Analysis*

The Court must therefore determine which elements of plaintiff's comparisons are not protectable and must therefore be filtered out in the first step.  Plaintiff describes the comparisons at issue as similar to a "factual compilation" or as something "akin to narratives describing research."[25]  It

---

[25]     R. Doc. 81 at 9.

contends that the material is therefore protectable.  Defendants, on the other hand, argue that the allegedly copied portions "constitute only recitations of facts—i.e., various features of the cars," and that these portions are not protected by copyright.[26]   They contend that, once these unprotected elements are excluded, the two works are not substantially similar.[27]

In works, such as instruction manuals, textbooks, guides, that "present factual information" through written expression, the fact themselves are not copyrightable.  *Logical Operations Inc. v. 30 Bird Media, LLC*, 354 F. Supp. 3d 286, 296-97 (W.D.N.Y. 2018); *see also Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045, 1051 (S.D.N.Y. 1996) (noting in the comparison of two science textbooks that the "facts underlying the science of embryology" are not protected by copyright).

But copyright protection extends to the "manner of expression" of a factual work, such as "the author's analysis or interpretation of [facts], the way he structures his material and marshals facts, his choice of words and the emphasis he gives to particular developments."  *Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987); *S. Credentialing Support Servs.*, 946 F.3d at 783 (stating that copyright "does extent to the creative elements

---

[26]   R. Doc. 87 at 2-3.
[27]   *Id.*

of compilations of facts . . . including the selection and arrangement of information that enable effective use").  That said, copyright in factual compilations is regarded as "thin" because it extends only to "the particular . . . original selection or arrangement of facts," and never to the facts themselves.  *Feist*, 499 U.S. at 350.  Additionally, under the *scenes a faire* doctrine, even the expression, selection, and arrangement of facts may not receive copyright protection in some cases if they are "standard, stock or common to a particular subject matter or are dictated by external factors," such as "industry demand and practice."  *Eng'g Dynamics*, 26 F.3d at 134.

Furthermore, single words and short phrases are not entitled to protection.  *Batiste*, 28 F. Supp. 3d at 613; *see also* 37 C.F.R. § 202.1(a) (stating that "[w]ords and short phrases such as names, titles, and slogans; familiar symbols or designs, . . . [and] mere listing of ingredients or contents" are "not subject to copyright").  This is especially true in the factual context, where "[e]ven verbatim reproduction of single words, ordinary phrases, and phrases typically expressed in a limited number of stereotyped fashion, may not establish infringement of a fact work . . . because in many cases such short phrases are not sufficiently expressive to merit protection and because protecting some short phrases is tantamount to protecting the idea itself." *Garman v. Sterling Pub. Co.*, No. 91-882, 1992 WL 12561293, at *5-6 (N.D.

Cal. Nov. 5, 1992) (citing *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992)).

Here, plaintiff has cited several words, phrases, and occasionally full sentences in the defendants' comparisons which it asserts are instances of verbatim copying from its protected work.[28]

| Advanta-STAR[29] | Hyundai of Slidell |
|---|---|
| **2019 Hyundai Sonata compared with the 2019 Toyota Camry** | **2019 Hyundai Sonata vs 2019 Toyota Camry** |
| **SAFETY** Both the Sonata and the Camry have standard driver and passenger frontal airbags, front side-impact airbags, driver knee airbags, side-impact head airbags, front seatbelt pretensioners, front wheel drive, height adjustable front shoulder belts, four-wheel antilock brakes, traction control, *electronic stability* systems to prevent skidding, daytime running lights, rearview cameras, available crash mitigating brakes, *lane departure warning* systems and rear parking sensors.<br><br>**WARRANTY** The *Sonata comes with a full 5-year/60,000-mile basic warranty, which covers the entire car and includes 24-hour roadside assistance. The Camry*'s | The midsize sedan is the type of car that many Slidell drivers have to keep their families comfortable, entertained and safe.   In 2019 these two vehicles demonstrate all these characteristics. Lets begin to Compare between the 2019 Hyundai Sonata & the 2019 Toyota Camry to find out why the Sonata is the recommended vehicle right here at your doorstep in the Slidell market.<br><br>**A Safer SUV for Slidell Drivers** All drivers will agree that having a safe vehicle is crucial for themselves and their family members.   In 2019 the Hyundai Sonata received a Superior rating for its front crash prevention test, while the Toyota Camry only received an Advance score.  The Insurance Institute |

---

[28]   R. Docs. 70-6 at 17-36 & 70-12 at 5-10.

[29]   Portions that are underlined and italicized represent text that plaintiff alleges was directly copied.

15

*3-year/36,000-mile basic warranty expires 2 years and 24,000 miles sooner. Hyundai's powertrain warranty covers the Sonata 5 years and 40,000 miles longer than Toyota covers the Camry. Any repair needed on the engine, transmission, axles, joints or driveshafts is fully covered for 10 years or 100,000 miles. Coverage* on the *Camry ends after only 5 years or 60,000 miles. The Sonata*'s *corrosion warranty is 2 years longer than the Camry*'s *(7 vs. 5 years).*

**RELIABILITY**
To reliably start during all conditions and help handle large electrical loads, the Sonata has a standard 608-amp battery. The Camry's 600-amp battery isn't as powerful. J.D. Power and Associates' 2018 Initial Quality Study of new car owners surveyed provide the statistics that show that Hyundai vehicles are better in initial quality than Toyota vehicles. J.D. Power ranks Hyundai third in initial quality, above the industry average. With 22 more problems per 100 vehicles, Toyota is ranked 17th, below the industry average. J.D. Power and Associates' 2018 survey of the owners of three-year old vehicles provides the long-term dependability statistics that show that Hyundai vehicles are more reliable than Toyota vehicles. J.D. Power ranks Hyundai 6th in reliability, above the industry average. With 3 more problems per 100 vehicles, Toyota is ranked 8th.

**FUEL ECONOMY AND RANGE**
To lower fuel costs and make buying fuel easier, the Hyundai Sonata uses regular unleaded gasoline. The Camry XSE/XLE

for Highway Safety thinks high of each vehicle, as it awarded both the TOP SAFETY PICK & rating for their 2019 models. The Hyundai Sonata boasts several impressive safety features, too, including Brake Assist, *Electronic Stability* Control & *Lane Departure Warning*. It also comes standard with Blind Sport Detection with Rear Cross-Traffic Alert. While the Toyota Camry offers an equally impressive amount of safety features, it doesn't come standard with Blind Spot Detection with Rear Cross- Traffic Alert.

**Performance Drive**
Both the 2019 Hyundai Sonata and 2019 Toyota Camry come with multiple engine options and impressive performance ratings. The ultimate terms of power, the Hyundai Sonata has a 2.4L 4-Cyclinder twin-scroll turbo engine that reaches 245 horsepower & 260lb-ft of torque. The Toyota Camry's 2.5L 4-cylinder engine can only reach 203 horsepower and 184 lb-ft of torque.

**Interior Features**
Both the Hyundai Sonata and Toyota Camry offer impressive technology features, including a 7-inch touchscreen, a 6-speaker sound system, and Bluetooth® capability. You can also easily sync your smartphone to the Hyundai Sonata through Apple CarPlayTM or Android AutoTM to access all your preferred media options.

**Recognition**

requires premium, which can cost 20 to 55 cents more per gallon. The Sonata has 4 gallons more fuel capacity than the Camry L's standard fuel tank (18.5 vs. 14.5 gallons), for longer range between fill-ups. The Sonata has 2.5 gallons more fuel capacity than the Camry LE/SE/XLE/XSE's standard fuel tank (18.5 vs. 16 gallons).

**TRANSMISSION**
The Sonata offers an available sequential manual gearbox (SMG). With no clutch pedal to worry about and a fully automatic mode, an SMG is much more efficient than a conventional automatic but just as easy to drive. The Camry doesn't offer an SMG or a conventional manual transmission.

**BREAKS AND STOPPING**
For better stopping power the Sonata's brake rotors are larger than those on the Camry:

| | Sonata | Camry |
|---|---|---|
| Front Rotors | 12.6 inches | 12 inches |
| Rear Rotors | 11.2 inches | 11.06 inches |

The Sonata stops much shorter than the Camry:

| | Sonata | Camry | |
|---|---|---|---|
| 70 to 0 MPH | 165 feet | 175 feet | Car and Driver |
| 60 to 0 MPH | 120 feet | 123 feet | Motor Trend |

**SUSPENSION AND HANDLING**
The Sonata has engine speed sensitive variable-assist power steering, for low-effort parking, better control at highway speeds and during hard cornering, and a better feel of the road. The Camry doesn't

If performance, roomier interior and more standard technology and safety features are in the top of your priority list, the 2019 Hyundai Sonata is one of the best compact midsize car you can buy. This well rounded midsize sedan continues to be a strong preference for a family car earning its place in the Slidell market. However check out our used inventory if you still have in mind Toyota Camry. We are proudly to help you make the right choice her at Hyundai of Slidell.

### _**Warranty**_ **Coverage**
Hyundai _Sonata comes with a full 5-year/ 60,000 mile basic warranty, which covers the entire car and includes 24-hour road assistance. The_ Toyota _Camry 3-year/36,0000 mile basic warranty expires 2 years and 24,000 miles sooner._

### **Power Train Warranty**
_Hyundai's power train warranty covers the Sonata 5 years and 40,000 miles longer than_ the _Toyota covers the Camry. Any repair needed on the engine, transmission, axles, joints or driveshafts fully covered for 10 years or 100,000 miles._ The Toyota Camry coverage ends after only 5 years or 60,000 miles.

### **Corrosion Warranty**
_The_ Hyundai _Sonata corrosion warranty is 2 years longer than the Toyota Camry (7_ years _vs 5 years)._

offer variable-assist power steering. For better maneuverability, the Sonata's turning circle is 1.8 feet tighter than the Camry L/LE's (35.6 feet vs. 37.4 feet). The Sonata's turning circle is 2.4 feet tighter than the Camry SE/XLE/XSE's (35.6 feet vs. 38 feet).

**PASSENGER SPACE**

Because it has more passenger and cargo room, the EPA rates the Sonata a Large car, while the Camry is rated a Mid-size. The Sonata has 5.7 cubic feet more passenger volume than the Camry (106.1 vs. 100.4). The Sonata has 2.1 inches more front headroom, 3.4 inches more front legroom, .2 inches more front shoulder room, 1.4 inches more rear hip room and .8 inches more rear shoulder room than the Camry.

**CARGO CAPACITY**

The Sonata has a much larger trunk than the Camry (16.3 vs. 15.1 cubic feet). The Sonata's standard rear seats fold to accommodate long and bulky cargo. The Camry L doesn't offer folding rear seats. With its sedan body style, valet key, locking rear seatbacks and remote trunk release lockout, the Sonata offers cargo security. The Camry's non-lockable remote release defeats cargo security. To make loading groceries and cargo easier when your hands are full, just waiting momentarily behind the back bumper can open the Sonata SEL/Sport/Limited's trunk, leaving your hands completely free. The Camry doesn't offer a hands-free gesture to open its trunk, forcing you to put cargo down if your hands are full.

Call us today at Hyundai of Slidell if you'd like more information on the Warranty that comes with your new Hyundai Tucson.

985-205-3914

**SERVICING EASE**

The Sonata has a maintenance free battery for long life without checking the battery's water level. The Camry doesn't have a maintenance free battery, so the water level in the battery's cells must be checked often to prevent damage.

**ERGONOMICS**

When two different drivers share the Sonata Limited, the memory seats and mirrors make it convenient for both. Each setting activates different, customized memories for the driver's seat position and outside mirror angle. The Camry doesn't offer a memory system. The Sonata Limited's standard easy entry system glides the driver's seat back when the door is unlocked or the ignition is switched off, making it easier for the driver to get in and out. The Camry doesn't offer an easy entry system. Consumer Reports rated the Sonata's headlight performance "Good" to "Very Good" (depending on model and options), a higher rating than the Camry's headlights, which were rated "Fair." To help drivers see further while navigating curves, the Sonata Limited has standard adaptive headlights to illuminate around corners automatically by reading vehicle speed and steering wheel angle. The Camry doesn't offer cornering lights. The Sonata's standard outside mirrors include heating elements to clear off the mirrors for better visibility. Heated mirrors cost extra on the Camry and aren't offered on the Camry L. Standard air-conditioned seats in the Sonata Limited keep the driver and front passenger comfortable and take the sting out of hot seats in summer. The Camry doesn't offer

air-conditioned seats. On extremely cold winter days, the Sonata SEL/Sport/Limited's standard heated steering wheel provides comfort, allowing the driver to steer safely and comfortably before the car heater warms up. The Camry doesn't offer a heated steering wheel.

**ECONOMIC ADVANTAGES**
According to The Car Book by Jack Gillis, the Sonata is less expensive to operate than the Camry because typical repairs cost much less on the Sonata than the Camry, including $144 less for a water pump, $31 less for front brake pads, $253 less for a starter, $213 less for fuel injection, $140 less for a fuel pump, $169 less for front struts, $782 less for a timing belt/chain and $288 less for a power steering pump.

**RECOMMENDATIONS**
The Hyundai Sonata has won recognition from these important consumer publications:

Consumer Reports® Recommends Car Book "Best Bet"

| Sonata | Camry |
|--------|-------|
| TRUE | Top Pick |
| TRUE | TRUE |



© 1991-2021 Advanta-STAR Automotive Research. All rights reserved. Who We Are

View the disclaimers, limitations and notices about EPA fuel mileage, crash tests, copyrights, trademarks, and other issues.

| 2019 Hyundai Santa Fe compared with the 2019 Kia Sorento | 2019 Hyundai Santa Fe vs 2019 Kia Sorrento SUV |
|---|---|
| **SAFETY** | |

Both _the Santa Fe and Sorento have child safety locks to prevent children from opening the rear doors. The Santa Fe_ has power child safety locks, _allow_ing the _driver to activate and deactivate them from the driver's seat and to know when they're engaged._  The Sorento's child locks have to be individually engaged at each rear door with a manual switch.  The driver can't know the status of the locks without opening the doors and checking them.

In the past twenty years hundreds of infants and young children have died after being left in vehicles, usually by accident. When turning the vehicle off, drivers of the Santa Fe SEL Plus/Limited/Ultimate are reminded to check the back seat when a sensor determines the back seat is occupied. The Sorento doesn't offer a back seat reminder.  Over 200 people are killed each year when backed over by motor vehicles. _The Santa Fe has a standard Rear Cross-Traffic Collision Avoidance Assist that uses rear sensors to monitor and automatically apply the brakes to prevent a rear collision. The Sorento doesn't offer_ backup collision prevention brakes.

_The Santa Fe SEL/Limited/Ultimate_ has standard _Blue Link, which uses a global positioning satellite (GPS) receiver and a cellular system to remotely unlock your doors if you lock your keys in, help track down your vehicle if it's stolen or send emergency personnel to the scene if any airbags deploy._  The Sorento doesn't offer a GPS response system, only a navigation computer with no live response for emergencies, so if you're involved in an

Re-imagined from the pavement to its panoramic sunroof, the bold new 2019 Hyundai Santa Fe design infuses raw energy with a distinctive presence. Add all the innovative safety and technology features along with America's Best Warranty and you'll understand why the Santa Fe continues to dominate SUVs as the ultimate family-adventure vehicle.

**A _Safe_r SUV for Slidell Drivers**
All drivers will agree that having a safe vehicle is crucial for themselves and their family members.  _Both the Santa Fe and Sorento_ are well known for their safety.  However, the 2019 Hyundai Santa Fe safety features surpass the Sorento in both quantity and quality.  To start, _the Santa Fe has a standard Rear Cross-Traffic Collision Avoidance Assist that uses rear sensors to monitor and automatically apply the brakes to prevent a rear collision.  The_ Kia _Sorento does n_ot _offer_ this feature on standard vehicles.  _The_ 2019 _Santa Fe and_ 2019 _Sorento both have child safety locks to prevent children from opening the rear doors. The Santa Fe_ goes above and beyond with _power child safety locks_, which _allow the driver to activate and deactivate them from the driver's seat and to know when the locks are engaged._  Hyundai's new Santa Fe won the 2019 IIHS Top Safety Pick+; so if safety is a must, then the new Santa Fe you can trust.

**Tech Specs**

accident and you're incapacitated help may not come as quickly.

_Both the Santa Fe and the Sorento_ have standard driver and passenger frontal airbags, front side-impact airbags, side-impact head airbags, front seatbelt pretensioners, front-wheel drive, height adjustable front shoulder belts, plastic fuel tanks, four-wheel antilock brakes, traction control, electronic stability systems to prevent skidding, _rearview_ cameras, available all-wheel drive and around view monitors.

**WARRANTY**
_The Santa Fe's corrosion warranty is 2 years_ and unlimited miles _longer than the Sorento_'s (_7_/unlimited vs. 5/100,000).

**ENGINE**
_The Santa Fe 2.0T's standard 2.0 turbo 4 cyl. Produces 8 lbs.-ft. more torque_ (_260_ vs. _252_) _than the Sorento's optional 3.3 DOHC V6._   The Santa Fe's 2.2 turbo diesel produces 5 more horsepower (190 vs. 185) and 144 lbs.-ft. more torque (322 vs. 178) than the Sorento's standard 2.4 DOHC 4 cyl.   The Santa Fe's 2.2 turbo diesel produces 70 lbs.-ft. more torque (322 vs. 252) than the Sorento's optional 3.3 DOHC V6.

**FUEL ECONOMY AND RANGE**
_On the EPA test cycle the Santa Fe AWD with its standard engine gets better highway fuel mileage than the Sorento AWD 4 cyl. (21 city/27 hwy._ vs. _21 city/26 hwy_).   In heavy traffic or at stoplights the Santa Fe's engine automatically turns off

The 2019 Santa Fe and the 2019 Kia Sorento both incorporate standard safety and technology features. Providing cutting edge technology in a standard car is Hyundai's game, and we play it well.   _The_ 2019 _Santa Fe SEL/Limited/Ultimate_ comes equipped with _Blue Link, which uses a global positioning satellite (GPS) receiver and a cellular system to remotely unlock your doors if you lock your keys in, help track down your vehicle if it's stolen or send emergency personnel to the scene if any airbags deploy_.   While Kia does offer a similar feature, they do not provide it as a standard feature. On the dashboard, the new Santa Fe offers a 7-inch pristine touch screen, which provides _rear-view_, Android Auto, and Apple CarPlay; along with basic radio and GPS.   Safety is of the upmost importance which is why the new Santa Fe offers automatic emergency braking with pedestrian detection, driver attention monitoring, adaptive cruise control with full stop-and-go capability, blind spot monitoring, lane keep assist, rear cross traffic alert, automatic high-beam headlights, and safe exit assist. If you choose to go with _the_ 2019 _Santa Fe Ultimate_, expect Hyundai's _standard heads-up display_, which _projects speed and other key instrumentation readouts in front of_ your _line of sight, allowing_ you _to view information without diverting_ your _eyes from the road_. Although the 2019 _Kia Sorento_ offers basic features similar to our new 2019 Santa Fe, they couldn't quite keep up with our advanced technological

when the vehicle is stopped, saving fuel and reducing pollution. The engine is automatically restarted when the driver gets ready to move again. (Start/Stop isn't accounted in present EPA fuel mileage tests.) The Sorento doesn't offer an automatic engine start/stop system.

## SUSPENSION AND HANDLING
The Santa Fe has standard front and rear gas-charged shocks for better control over choppy roads. The Sorento's suspension doesn't offer gas-charged shocks. The Santa Fe has a standard automatic load leveling suspension to keep ride heigh level with a heavy load or when towing. The Sorento doesn't offer a load leveling suspension.

## CHASSIS
The Hyundai Santa Fe may be more efficient, handle and accelerate better because it weighs up to about 200 pounds less than the Kia Sorento.

## CARGO CAPACITY
The Santa Fe 2.2D's cargo area provides more volume than the Sorento.

| | Santa Fe | Sorento |
|---|---|---|
| Behind Third Seat | 11.6 cubic feet | 11.3 cubic feet |

## ERGONOMICS
*The Santa Fe Ultimate* has a *standard heads-up display* that *projects speed and other key instrumentation readouts in front of* the driver's *line of sight, allowing* drivers *to view information without diverting* their *eyes from the road.* The *Sorento* doesn't offer a heads-up display. The Santa Fe's standard side window demisters help clear frost or condensation

specialties that we offer in our standard vehicles.

## Speed & Efficiency
The new 2019 Santa Fe and 2019 Kia Sorento both offer a smooth gas efficient ride, however, Hyundai's 2019 Santa Fe goes above the rest to provide you with an excellent driving experience. *The Santa Fe 2.0T's standard 2.0 turbo 4 cyl. produces 8 lbs.-ft. more torque than the Sorento's optional 3.3 DOHC V6. On the EPA test cycle the Santa Fe AWD with its standard engine gets better highway fuel mileage than the Sorento AWD 4 cyl.*

| *2019 Hyundai Santa Fe* | *2019 Kia Sorrento* |
|---|---|
| *260 lb-ft* | *252 lb-ft* |
| *21 city / 27 hwy* | *21 city / 26 hwy* |

## Recognition
Awards and accolades show how Hyundai makes driving safer, more convenient and ultimately more rewarding. The 2019 Santa Fe's Safe Exit Assist and Rear Occupant Alert have been honored as two of the 10 Best Vehicle Technology Innovations for 2018 and has been recognized as a Silver IDEA winner by the Industrial Designers Society of America (IDSA). If performance, premium interior and more innovative technology and safety features are in the top of your priority list, the 2019 Hyundai Santa Fe is one of the best family-sized SUVs you can buy. This well- rounded SUV continues to be

from the side windows in the winter. The Sorento doesn't even offer side window demisters, so the driver may have to wipe the windows from the outside to gain side vision. The Santa Fe Ultimate's standard GPS navigation system has a realtime traffic update feature that plots alternative routes to automatically bypass traffic problems. (Service not available in all areas.) The Sorento's navigation system doesn't offer real-time traffic updates.

## RECOMMENDATIONS
The Hyundai Santa Fe outsold the Kia Sorento by 34% during 2017.



© 1991-2021 Advanta-STAR Automotive Research. All rights reserved. Who We Are

View the disclaimers, limitations and notices about EPA fuel mileage, crash tests, copyrights, trademarks, and other issues.

a strong preference for a family car, earning its place in the Slidell market.

## Warranty Coverage
Hyundai's new *Santa Fe comes with a full 5-year/60,000 mile basic warranty, which covers the entire* car and includes 24-hour road assistance. The new Kia Sorento has a similar warranty.

## Power Train Warranty
*Hyundai's power train warranty* fully *covers any repair needed on the engine, transmission, axles, joints or driveshafts for 10 years or 100,000 miles*. The Kia Sorento offers the same warranty.

## Corrosion Warranty
*The Hyundai Santa Fe corrosion warranty is 2 years longer than the Kia Sorento (7* years *vs. 5 years).*

Call us today at Hyundai of Slidell if you'd like more information on the Warranty that comes with your new Hyundai Santa Fe.

| **2019 Hyundai Tucson compared with the 2019 Nissan Rogue** | **2019 Hyundai Tucson vs 2019 Nissan Rogue in Slidell LA** |
|---|---|

## SAFETY
The Tucson has standard Active Head Restraints, which use a specially designed headrest to protect the driver and front passenger from whiplash. During a rear-end collision, the Active Head Restraints system moves the headrests forward to prevent neck and spine injuries. The Rogue doesn't offer a whiplash protection system.

The Hyundai Tucson was ranked one of the best compact SUVs you can buy in 2019 beating the Nissan Rouge ranking in the top 10 position of 2019. Compare between the 2019 Hyundai Tucson & the 2019 Nissan Rouge to find out why the Tucson is the best compact SUV in the Slidell market.

The Tucson's optional driver alert monitor detects an inattentive driver then sounds a warning and suggests a break. According to the NHTSA, drivers who fall asleep cause about 100,000 crashes and 1500 deaths a year. The Rogue doesn't offer a driver alter monitor.

Both the Tucson and the Rogue have standard driver and passenger frontal airbags, front side-impact airbags, side-impact head airbags, front seatbelt pretensioners, front wheel drive, height adjustable front shoulder belts, four-wheel antilock brakes, traction control, electronic stability systems to prevent skidding, rearview cameras, available all wheel drive, crash mitigating brakes, daytime running lights, lane departure warning systems, blind spot warning systems, rear parking sensors and rear cross-path warning.

*The National Highway Traffic Safety Administration* does 35 MPH front *crash test* on new vehicles. In this rest, results indicate that *the* Hyundai *Tucson* is safer than the Nissan Rogue:

| Tucson | Rogue |
| --- | --- |

## A Safer SUV for Slidell Drivers

In 2019 the Hyundai *Tucson* earned *Top* Safety *Pick* designation from *the Insurance Institute for Highway Safety*, passing every IIHS crash *test* with flying colors. Equipped with Optional Automatic Emergency Brake, HID Headlights with Dynamic Bending Lights. *The National Highway Traffic Safety Administration* give *the Tucson* a *5-star overall crash test*ing rating, *5-stars* in *front*al and *side* crash *test*. Every *Tucson* comes with *rear-view camera*. Additional safety features available in 2019 include *lane departure warning* which is not available on the Nissan Rogue.

## Tech Specs

Available Apple CarPlay™ and Android Auto™ make the 2019 Hyundai Tucson fully compatible with your smartphone. That way, you can easily access your music and apps right on your dashboard display. Both vehicles offer auxiliary and USB ports as well as standard satellite radio.

Hyundai's *Blue Link*® (https://www.hyundaiofslidell.com/blue-link.htm) mobile app allows you to control many of your car's systems from the palm of your hand. The car-integrated system can even send for help automatically in the event of a collision. The smartphone app can be used for tasks, such as locking and *unlock*ing *your* vehicle remotely, or pre-heating or cooling the interior so it's

| OVERALL STARS | 5 Stars | 4 Stars |
|---|---|---|
| Driver | | |
| STARS | 5 Stars | 4 Stars |
| HIC | 172 | 294 |
| Neck Injury Risk | 21% | 31% |
| Neck Stress | 219 lbs. | 284 lbs. |
| Leg Forces (l/r) | 64/54 lbs. | 856/397 lbs. |
| Passenger | | |
| STARS | 5 Stars | 3 Stars |
| HIC | 226 | 298 |
| Chest Compression | .6 inches | .7 inches |
| Neck Injury Risk | 37% | 63% |
| Neck Stress | 162 lbs. | 235 lbs. |
| Neck Compression | 50 lbs. | 109 lbs. |
| Leg Forces (l/r) | 45/43 lbs. | 393/402 lbs. |

New test not comparable to pre-2011 test results. More stars = Better. Lower test results = Better.

*The National Highway Traffic Safety Administration* does side impact tests on new vehicles. In this test, which crashes the vehicle into a flat barrier at 38.5 MPH and into a post at 20 MPH, results indicate that the Hyundai Tucson is safer than the Nissan Rogue:

| | Tucson | Rogue |
|---|---|---|
| Front Seat | | |
| STARS | 5 Stars | 5 Stars |
| Chest Movement | .8 inches | 1 inches |
| Abdominal Force | 107 G's | 202 G's |
| Hip Force | 356 lbs. | 477 lbs. |
| Rear Seat | | |
| STARS | 5 Stars | 5 Stars |
| Hip Force | 482 lbs. | 783 lbs. |
| Into Pole | | |
| STARS | 4 Stars | 4 Stars |
| Max Damage Depth | 14 inches | 15 inches |
| HIC | 312 | 547 |

comfortable before you even open the door.

## *Reliability*
*J.D. Power and Associates'* in 2019 ranked *the* Hyundai *Tucson* the Highest Ranked *Small SUV in initial quality*. Hyundai is one of the industry leaders *in Initial Quality rank*ing them *6th,* which is *above the industry average*. 5 *more problems per 100 vehicles, Nissan is ranked 10th.*

## Drive Faster and more efficiency
Consumer reports *tested in Motor Trend the Tucson 1.6T is faster than the Nissan Rogue 4cyl.* Also, *the Tucson has 1.9 gallons more than the Rogue* therefore *it has more fuel capacity for longer range between fill-ups.* It's no wonder the Tucson is preferred over the Rouge for Slidell drivers.

*Tucson brake rotors are longer than those on the Rouge:*

| Rotors | Tucson | Rogue |
|---|---|---|
| Front | 12 inches | 11.65 inches |
| Rear | 11.9 inches | 11.5 inches |

*Consumer Reports* found that *the* Tucson *stops shorter than the Rouge:*

| | Tucson | Rogue |
|---|---|---|
| 60 to 0 MPH | 128 Feet | 134 Feet |
| 60 to 0 MPH (Wet Surface) | 140 Feet | 142 Feet |

## Outside Awards and Recognition
If safety and security are the top of your priority list, the 2019 Hyundai Tucson is one of the best compact SUVs you can buy. This well rounded SUV has strong predicted reliability rating earning its

New test not comparable to pre-2011 test results. More stars = Better. Lower test results = Better.

**WARRANTY**

The _Tucson comes with a full 5-year/60,000-mile basic warranty, which covers the entire_ truck _and includes 24-hour roadside assistance. The Rogue's 3-year/36,000-mile basic warranty expires 2 years and 24,000 miles sooner._

_Hyundai_'s _powertrain warranty covers the Tucson 5 years and 40,000 miles longer than Nissan_ covers the _Rogue_. _Any repair needed on the engine, transmission, axles, joints, or driveshafts is fully covered for 10 years or 100,000 miles. Coverage_ on the _Rogue ends after only 5 years or 60,000 miles._

_The Tucson's corrosion warranty is 2 years longer than the Rogue_'s _(7 vs. 5 years)._

**RELIABILITY**

J.D. Power and Associates rated the Tucson first among small SUVs in their 2018 Initial Quality Study. The Rogue isn't in the top three in its category.

_J.D. Power and Associates'_ 2018 _Initial Quality_ Study of new car owners surveyed provide the statistics that show that Hyundai vehicles are better in initial quality than Nissan vehicles. J.D. Power ranks Hyundai third _in_ initial quality, above the industry average. With 11 _more problems per 100 vehicles, Nissan is ranked 10th_.

place in the Slidell market. The Rogue was ranked behind the Tucson based on performances and what owners expect. However check out our used inventory if you still have in mind Nissan Rouge.

**Warranty Coverage**

Hyundai _Tucson comes with a full 5-year/60,000 mile basic warranty, which covers the entire_ SUV _and includes 24-hour roadside assistance. The Rogue's 3-year/36,000 mile basic warranty expires 2 years and 24,000 miles sooner._

**Power Train Warranty**

_Hyundai_'s _powertrain warranty covers the Tucson 5 years and 40,000 miles longer than the Nissan Rogue_. _Any repair needed on the engine, transmission, axles, joints, or driveshafts is fully covered for 10 years or 100,000 miles. The Nissan Rogue coverage_ ends after only 5 years or 60,000 miles.

**Corrosion Warranty**

_The_ Hyundai _Tucson corrosion warranty is 2 years longer than the Nissan Rogue_ _(7 years vs. 5 years)._

Call us today at Hyundai of Slidell if you'd like more information on the Warranty that comes with your new Hyundai Tucson.

J.D. Power and Associates' 2018 survey of the owners of three-year-old vehicles provides the long-term dependability statistics that show that Hyundai vehicles are more reliable than Nissan vehicles. J.D. Power ranks Hyundai 6th in reliability, above the industry average. With 9 more problems per 100 vehicles, Nissan is ranked 10th.

From surveys of all its subscribers, Consumer Reports' December 2018 Auto Issue reports that Hyundai vehicles are more reliable than Nissan vehicles. Consumer Reports ranks Hyundai 4 places higher in reliability than Nissan.

**ENGINE**
The Tucson SEL/Sport/Limited's standard 2.4 DOHC 4 cyl. Produces 5 more horsepower (181 vs. 176) than the Rogue Hybrid's standard 2.0 DOHC 4 cyl. Hybrid.

**FUEL ECONOMY AND RANGE**
*The Tucson has 1.9 gallons more* fuel capacity *than the* Rogue (16.4 vs. 14.5 gallons), *for longer range between fill-ups.*

**ENVIRONMENTAL FRIENDLINESS**
The U.S. Environmental Protection Agency (EPA) certifies the Hyundai Tucson as a "Partial Zero Emissions Vehicle" (PZEV). The Nissan Rogue is only certified to "Super Ultra Low Emissions Vehicle" (SULEV) standards.

**BRAKES AND STOPPING**
For better stopping power the *Tucson*'s *brake rotors are larger than those on the* Rogue:

|  | Tucson | Rogue | Rogue Hybrid |
|---|---|---|---|
| Front Rotors | 12 inches | 11.65 inches | 11.8 inches |
| Rear Rotors | 11.9 inches | 11.5 inches | 11.7 inches |

The Tucson *stops shorter than the Rogue*:

|  | Tucson | Rogue |  |
|---|---|---|---|
| 60 to 0 MPH | 128 feet | 134 feet | Consumer Reports |
| 60 to 0 MPH (Wet) | 140 feet | 142 feet | Consumer Reports |

**TIRES AND WHEELS**
For better traction, the Tucson Sport/Limited's tires are larger than the largest tires available on the Rogue (245/45R19 vs. 225/65R17). The Tucson SENalue's standard tires provide better handling because they have a lower 60 series profile (height to width ratio) that provides a stiffer sidewall than the Rogue S/SV/Hybrid's standard 65 series tires. The Tucson Sport/Limited's tires have a lower 45 series profile than the Rogue SL's 55 series tires.

**SUSPENSION AND HANDLING**
The Tucson has standard front and rear gas-charged shocks for better control over choppy roads. The Rogue's suspension doesn't offer gas-charged shocks. The Tucson SE handles at .82 G's, while the Rogue SL AWD pulls only .77 G's of cornering force in a Motor Trend skidpad test. The Tucson Limited AWD executes Motor Trend's "Figure Eight" maneuver 1.8

seconds quicker than the Rogue SL AWD (27 .1 seconds@ .64 average G's vs. 28.9 seconds @ .58 average G' s). For better maneuverability, the Tucson's turning circle is 2.7 feet tighter than the Rogue's (34 .9 feet vs. 37.6 feet).

**CHASSIS**

The Tucson is 8.3 inches shorter than the Rogue, making the Tucson easier to handle, maneuver and park in tight spaces.

**PASSENGER SPACE**

The Tucson has 1.6 inches more front shoulder room, .7 inches more rear headroom, .3 inches more rear legroom and 2.4 inches more rear hip room than the Rogue.

**CARGO CAPACITY**

The Tucson's cargo area is larger than the Rogue's in almost every dimension:

|  | Tucson | Rogue |
|---|---|---|
| Length to seat (2nd/1st) | 34.3"/69.5" | 33.5"/68.5" |
| Max Width | 53" | n/a |
| Min Width | 40.7" | 44" |
| Height | 35.2" | n/a |

**TOWING**

The Tucson's standard towing capacity is much higher than the Rogue's (1500 vs. 1102 pounds).

**SERVICING EASE**
The Tucson has a maintenance free battery for long life without checking the battery's water level. The Rogue doesn't have a maintenance free battery, so the water level in the battery's cells must be checked often to prevent damage.

**ERGONOMICS**
To help each driver find a more comfortable driving position, the Tucson has a telescoping steering wheel. Much better than just a tilt steering wheel or adjustable seat, this allows a short driver to sit further from the steering wheel while maintaining contact with the pedals.  The Rogue doesn't offer a telescoping steering wheel.

The power windows standard on both the Tucson and the Rogue have locks to prevent small children from operating them.  When the lock on the Tucson is engaged the driver can still operate all of the windows, for instance to close one opened by a child.  The Rogue prevents the driver from operating the other windows just as It does the other passengers.

The Tucson Llmited's optional wipers adjust their speed and turn on and off automatically according to the amount of rainfall on the windshield. The Rogue's manually variable intermittent wipers have to be constantly adjusted.

The Tucson has a standard automatic headlight on/off feature. When the ignition is on, the headlights automatically turn on at dusk and off after dawn.  The Rogue has

an automatic headlight on/off feature standard only on the SV/SL.

To help drivers see further while navigating curves, the Tucson Limited offers optional adaptive headlights to illuminate around corners automatically by reading vehicle speed and steering wheel angle. The Rogue doesn't offer cornering lights.

The Tucson's standard outside mirrors Include heating elements to clear off the mirrors for better visibility, Nissan charges extra for heated mirrors on the Rogue.

Both the Tucson and the Rogue offer available heated front seats. The Tucson Limited also offers optional heated rear seats to keep those passengers extremely comfortable in the winter. Heated rear seats aren't available in the Rogue.

Optional air-conditioned seats in the Tucson Limited keep the driver and front passenger comfortable and take the sting out of hot seats in summer. The Rogue doesn't offer air-conditioned seats.

**ECONOMIC ADVANTAGES**
According to The Car Book by Jack Gillis, the Tucson is less expensive to operate than the Rogue because it costs $81 less to do the manufacturer's suggested maintenance for 50,000 miles. Typical repairs cost much less on the Tucson than the Rogue, including $6 less for a water pump, $7 less for a muffler, $12 less for front brake pads, $81 less for a starter, $112 less for fuel injection, $172 less for a fuel pump, $619

less for a timing belt/chain and $733 less for a power steering pump.

Salesman Contact Info
Matthew Carlin
504-722-9437
archard.mmc@gmail.com



© 1991-2021 Advanta-STAR Automotive Research. All rights reserved. Who We Are

View the disclaimers, limitations and notices about EPA fuel mileage, crash tests, copyrights, trademarks, and other issues.

The above comparisons demonstrate that defendants largely took unprotected factual information from plaintiff's comparisons. The various features of a car, such as its highway fuel milage, warranty options, or the length of its brake rotors, are objective facts that plaintiff admits were taken from other sources, and are thus not original.[30] And although plaintiff represents that collecting this factual information is a "massive undertaking"[31] that requires Advanta-STAR to study "countless resources for automotive information," it is well established that substantial effort or expense, by themselves, do not make a factual compilation protectable. *See*

---

[30]   R. Doc. 70-4 at 16 (Lemmon Deposition at 54:18-55:12).
[31]   R. Doc. 81 at 3-4.

*Feist*, 499 U.S. at 347-48 ("[T]he 1976 revisions to the Copyright Act leave no doubt that originality, not 'sweat of the brow,' is the touchstone of copyright protection in directories and other fact-based works."); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir. 1981) ("The valuable distinction in copyright law between facts and the expression of facts cannot be maintained if research is held to be copyrightable.").

Further, plaintiff concedes that it does not own a copyright in the names of vehicles being compared.[32]  Similarly, vehicle features or packages that are identified by name, such as "Rear Cross-Traffic Collision Avoidance Assist," "Blue Link," or "Santa Fe Ultimate" are not protectable.  *See* 37 C.F.R. § 202.1(a) (noting that names and titles are not subject to copyright). In addition to names, descriptions of a vehicle's features, used to "promote the product and identify the manufacturer," are not protectable and "cannot provide the basis for a claim of copyright infringement."  *See S.A.M. Elecs., Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1082 (N.D. Ill. 1999) (holding that a bullet-point list of "promotional phrases describing a product" are not protectable); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 710-11 (7th Cir. 1972) (finding that three paragraphs of text on a deodorant label are "descriptive and not copyrightable" because the "creativity reflected in

---

[32]     *Id.* at 25 (Lemmon Deposition at 91:10-23).

the development of the product itself does not give appropriate descriptive language . . . any separate value as a composition"). For example, the language that the Hyundai Santa Fe has a "standard heads-up display" that allows drivers "to view information without diverting [their] eyes from the road," or that it includes "24-hour roadside assistance" and a "rearview" camera, are simply factual descriptions of the vehicle's features, and are therefore unprotected. *See Implus Footcare, LLC v. Ontel Prods. Corp.*, No. 14-8726, 2015 WL 12655703, at *3 (C.D. Cal. Aug. 28, 2015) (finding that "verbal and visual descriptions" of a product, "such as whether [the product] can be used on various surfaces [is] not protectable.").

In addition to copying factual data, defendants also copied certain words and phrases from Advanta-STAR's comparisons. But many of the words and phrases that Advanta-STAR identifies in defendants' materials are not protected by copyright. Words such as "safe" or "unlock" are not original to Advanta-STAR's comparisons and cannot be copyrighted. Short phrases that defendants allegedly copied from plaintiff's comparisons, such as "fuel capacity," "child safety locks," or "EPA test cycle" are not entitled to copyright protection. *See Taylor v. IBM*, 54 F. App'x 794, 794 (5th Cir. 2002) (per curiam) (holding that the phrase "pre paid cash cards" is not protected because the "use of that description was only incidental to defendants'

alleged use of the idea of prepaid cash cards and because the allegedly copyrighted expression is inseparable from the idea for prepaid cash cards"). Moreover, phrases describing a vehicle's fuel capacity or engine type are "dictated solely [by] functional considerations" and "efficiency." *Kohus v. Mariol*, 328 F.3d 848, 856 (6th Cir. 2003). Such phrases are denied protection because they do not meet the minimal level of creativity necessary. *See Windsor v. Olson*, No. 16-934, 2019 WL 2080021, at \*5 (N.D. Tex. May 10, 2019) (finding that phrases like "First Order Bonus" are functional because "they define a compensation system and information contained therein and, therefore, are unoriginal" (citing *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996))).

Much of the allegedly copied material in the Tucson/Rogue and Sonata/Camry comparisons comes from plaintiff's warranty comparison sections. Plaintiff asserts that, among other things, defendants copied the names of the warranties—basic, powertrain, and corrosion warranties—by including them in their comparisons.[33] But the names of these warranties are technical terms that are used by car manufacturers to inform consumers about what a particular warranty covers, and therefore are not subject to copyright by Advanta-STAR. *Harner v. Wong Corp.*, No. 12-820, 2013 WL

---

[33] R. Doc. 70-12 at 5-10.

11542984, at *5 (D.N.M. Oct. 31, 2013) (finding that phrases which "are used to relay information about the business and products offered by the business" were not copyrightable).  Moreover, many of the allegedly copied words in this section, such as "year(s)," "covered," and "mile" are words that are generally acknowledged as fundamental to any description of a car warranty.  *Cf. McGraw-Hill, Inc. v. Worth Publishers, Inc.*, 335 F. Supp. 415, 420-21 (S.D.N.Y. 1971) (finding that the subject of an economics textbook restricts the language options available to an author given the "corpus of technical words and phrases whose meanings have been fixed" and "concepts whose importance is generally acknowledged").  Critically, plaintiff never explains why its comparisons of warranties in terms of years and milage are sufficiently original to warrant copyright protection, and why they are not instead a mere list of features likely to be found in any car review or comparison.  *Cf. DeBitetto v. Alpha Books*, 7 F. Supp. 2d 330, 334 (S.D.N.Y. 1998) (finding no copyright infringement when defendant's pet care book contained a list of poisons that tracks the language in plaintiff's poisons list almost "exactly" because a "list of poisons is the sort of list likely to be found in any book of pet care").

After filtering out the allegedly copied material that was not original to plaintiff's compilations, it is clear that the vast majority of the allegedly

37

copied content was factual in nature.  Accordingly, because defendants are free to take "'the bulk of the factual material from [plaintiff's] preexisting compilation' without infringing [on plaintiff's] copyright," plaintiff has not shown that the content defendants used constituted impermissible infringement.  *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726,729 (8th Cir. 2002) (quoting *BellSouth Advert. & Pub'g Corp. v. Donnelley Info. Pub'g, Inc.*, 999 F.2d 1436, 1445 (11th Cir. 1993) (en banc)); *see also Transwestern Pub'g Co. v. Multimedia Mktg. Assocs., Inc.*, 133 F.3d 773, 776-77 (10th Cir. 1998) ("[W]hen it comes to factual compilations, after *Feist*, it takes virtually 'extensive verbatim copying' to constitute infringement." (quoting Jane C. Ginsburg, *No "Sweat?"  Copyright and Other Protection of Works of Information After* Feist v. Rural Telephone, 92 Colum. L. Rev. 338, 349 (1992))).

### 2. *Side-by-Side Comparison*

At the comparison stage, plaintiff must now show that, from the perspective of an "ordinary observer," defendants' content is *substantially similar* to the protected aspects of its content.  *Nola Spice*, 783 F.3d at 552. Advanta-STAR contends that it has met this burden by showing that defendants copied language from its comparisons, and that said

comparisons are "certainly protectable" because they contain plaintiff's unique selection, arrangement, and expression of factual information.[34] Although it is well established that copyright protects the original aspects of a factual compilation, such protection is considered "thin" because it does not extend to facts and ideas within the compilation. *See Feist*, 499 U.S. at 349 ("Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement.").  For example,

> [A] Westlaw licensee[ may] copy[] the text of a federal judicial opinion that he found in the Westlaw opinion database and giv[e] it to someone else [without infringement].  Westlaw's compilation of federal judicial opinions is copyrighted and copyrightable because it involves discretionary judgments regarding selection and arrangement.  But the opinions themselves are in the public domain . . . and so Westlaw cannot prevent its licensees from copying the opinions themselves as distinct from the aspects of the database that are copyrighted.

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) (citations omitted).  Here, plaintiff has failed to provide any evidence that defendants copied original elements of its database, as opposed to information that, like judicial opinions, are unprotected.  *See Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th

---

[34]     R. Doc. 81 at 9-10.

Cir. 2014) (affirming the dismissal of plaintiff's copyright claim where plaintiff had "not even attempt[ed] to specify exactly what portions of the . . . software are protectable, original elements[,] and which are unprotectable" (internal quotations omitted)); *see also Schurr v. Molacek*, No. 15-7135, 2016 WL 6680287, at *7 (E.D. La. Nov. 14, 2016) (granting defendant's motion for summary judgment where plaintiffs "d[id] not discuss which protected elements in [plaintiffs'] map compared to [defendant's] maps").

Although plaintiff asserts that its comparisons are original because of its selection and arrangement of facts, plaintiff has not timely or specifically alleged that defendants impermissibly copied such protected elements. Instead, plaintiff's complaint alleges that defendants copied specific language from its comparisons.[35]  But, as detailed above, the language that plaintiff alleges defendants copied is comprised of factual and other non-original statements that are not subject to copyright protection.

The Court notes that plaintiff contends, for the first time in its opposition to summary judgment, that defendants' copying goes "beyond

---

[35]    *See* R. Doc. 53 ¶ 16 (Amended Complaint) ("The text and information on the Infringing Webpages contained entire paragraphs that are identical to the copyright content of Plaintiff Advanta-STAR . . . ."); *see also* R. Doc. 70-12 at 1 (noting that plaintiff's counsel provided defendants "highlighted copies of the webpages from Hyundai of Slidell which demonstrate what your clients copied verbatim, including whole sections of the original comparisons").

verbatim copying," and that defendants have also "copied Advanta-STAR's *selection of the vehicles to be compared* as well as many of the *features that are being compared*."[36]   Here too, plaintiff falls short of pointing to any original elements of its comparisons, and instead asserts generally that "many of the features" being compared may be protectable.  Moreover, it is well-settled in the Fifth Circuit that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."  *Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) (citing *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)).  The Fifth Circuit has "repeatedly emphasized this rule."  *Id.* (collecting cases).  Given that plaintiff's complaint alleges only that defendants' infringement was the result of verbatim copying of unprotected content,[37] plaintiff cannot now assert, in its opposition, that the defendants' infringement also stems from their choice to compare certain vehicles and unspecified features.

---

[36]   R. Doc. 81-1 at 6-7 (emphasis added).

[37]   Additionally, during discovery, plaintiff provided defendants via email "highlighted copies of the webpages from Hyundai of Slidell which demonstrate what your clients copied verbatim."  R. Doc. 70-12 at 1. Notably, plaintiff does not claim that defendants copied protected material as to its selection of vehicles or the features compared.

In sum, after reviewing the allegedly copied portions of plaintiff's comparisons, the Court finds that any similarities are based almost exclusively on unprotectable elements of plaintiff's copyrighted database. *See Johnson v. Gordon*, 409 F.3d 12, 19 (1st Cir. 2005) ("[I]n assessing whether substantial similarity exists, an overall impression of similarity may not be enough . . . [i]f such an impression flows from similarities as to elements that are not themselves copyrightable." (internal citation omitted)). Once these unprotected elements are filtered out, plaintiff cannot carry its burden of showing that the two works are substantially similar. *See Frybarger*, 812 F.2d at 528 (holding that summary judgment for a defendant "is appropriate when plaintiff fails to make a sufficient showing that the . . . expressive elements of the works are substantially similar"). Instead, comparing only the protected elements of plaintiff's content to defendants' allegedly infringing content, plaintiff has shown, at most, that defendants copied a few isolated words and phrases from plaintiff's comparisons. The Court thus concludes that no reasonable juror could find that the two works in terms of protectable expression—*i.e.* just a handful of words and short phrases—are substantially similar.

Even assuming that the copied material included protected elements of plaintiff's comparisons, plaintiff still would be unable to show that

defendants misappropriated "*substantial elements*" of plaintiff's work.  *Nola Spice*, 783 F.3d at 552.  This is because no reasonable juror could find that defendants misappropriated substantial elements of plaintiff's content by copying scattered words and phrases that were especially concentrated in one topic—warranty—out of the seven to sixteen topics discussed in each of plaintiff's comparisons.  *See id.* (finding no substantial similarity where the copied material was insignificant to the work as a whole which was "dominated by unprotectable elements").

For these reasons, with respect to the three allegedly copied comparisons, defendants are entitled to judgment as a matter of law on Advanta-STAR's copyright-infringement claim.

### B.   Digital Millennium Copyright Act

Defendants also move on summary judgment to dismiss plaintiff's claim under the Digital Millennium Copyright Act ('DMCA'), 17 U.S.C. § 1202 (a)-(b), for allegedly removing plaintiff's copyright management information when it published its comparisons.[38]  Section 1202 of the DMCA "'protects the integrity of copyright management information' by prohibiting any person from intentionally removing or altering [copyright management

---

[38]   R. Doc. 70-3 at 13.

information] if he or she knows or has reasonable grounds to know it would 'induce, enable, facilitate, or conceal copyright infringement.'" *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 276 (5th Cir. 2020) (quoting 17 U.S.C. § 1202(b)).  In light of the Court's finding above that defendants alleged copying did not constitute copyright infringement, plaintiff is foreclosed from maintaining its claim under the DMCA.  *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318 (Fed. Cir. 2005) "[C]ourts generally have found a violation of the DMCA only when the alleged access was intertwined with a right protected by the Copyright Act.").  Accordingly, the Court grants defendants' motion for summary judgment as to plaintiff's claim under the DMCA.

## C.    Attorney's Fees and Costs

Defendants also request an award of costs and attorney's fees.[39]  The Copyright Act authorizes recovery of costs and provides that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505; *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016) (noting "the broad leeway § 505 gives to district courts").  The Supreme Court has provided "several nonexclusive factors" for

---

[39]    R. Doc. 70-3 at 14.

courts to consider when awarding attorney's fees: (1) frivolousness, (2) motivation, (3) objective unreasonableness, and (4) compensation and deterrence. *Kirstsaeng*, 579 U.S. at 202 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).  In considering these factors, the Court has advised district courts to place substantial, but not controlling, weight on the third factor.  *Id.* 1983-88.

Here, the Court finds no evidence that Advanta-STAR's suit was frivolous or objectively unreasonable.  *See Berg v. M&F Western Prods., Inc.*, No. 19-418, 2021 WL 264223, at *3 (E.D. Tex. June 28, 2021) ("The Court's grant of summary judgment does not necessarily mean that the claim was frivolous or objectively unreasonable.").  A claim is likely to be considered "frivolous" or "objectively unreasonable" when the "the lack of similarity between the unsuccessful plaintiff's work and the allegedly infringing work [is] obvious."  *Id.*  Given that plaintiff identifies several words and phrases that constituted verbatim copying of its content, the Court finds that Advanta-STAR's claims were not objectively unreasonable or frivolous.

Further, there is no indication that plaintiff pursued this litigation in bad faith.  To the contrary, plaintiff sent two letters to defendants seeking to resolve the alleged infringement prior to filing suit.[40]  *See Virgin Records*

---

[40]     R. Doc. 81 at 5.

*Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir. 2008) (per curiam) (noting that plaintiffs' attempts to resolve the matter prior to litigation suggested plaintiffs' did not prosecute the case with "malevolent intent"). Finally, because of the objective reasonableness of the suit, the Court finds no reason why Advanta-STAR should be deterred from bringing future suits. Accordingly, the Court denies defendants' request for attorney's fees.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment.  The Court DENIES defendants' request for attorney's fees.

New Orleans, Louisiana, this __20th__ day of January, 2022.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE